*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

EVAN TAYLOR ARMOGEDA,

Defendant-Appellant.

UNPUBLISHED
October 04, 2024
2:01 PM

No. 365184
Ingham Circuit Court
LC No. 21-000260-FC

Before: BORRELLO, P.J., and MURRAY and LETICA, JJ.

PER CURIAM.

Defendant appeals by right his convictions of, and sentences for, assault with intent to murder, MCL 750.83, carrying a dangerous weapon with unlawful intent, MCL 750.226, and third-degree fleeing and eluding, MCL 257.602a(3). The trial court sentenced defendant to serve concurrent prison terms of 360 months (30 years) to 600 months (50 years) for the assault conviction, 22 to 60 months (5 years) for the weapons conviction, and 12 to 60 months for the fleeing-and-eluding conviction. For the reasons set forth in this opinion, we affirm defendant's convictions, but remand to the trial court to conduct a hearing to determine the proper assessment of Prior Record Variable 2 (PRV 2) and other relief as outlined in this opinion.

## I. BACKGROUND

Defendant was convicted of stabbing Zackary Wickizer, an acquaintance of his ex-girlfriend, Abby O'Connor. O'Connor had informed defendant that she was pregnant with his child. Defendant moved from California to Michigan in November 2020 to pursue a relationship with O'Connor. O'Connor testified that by December 2020, she told defendant that she did not want to be in a relationship with him but that he could still be involved in their child's life. In the weeks leading up to the crime on January 11, 2021, defendant communicated multiple times with O'Connor, primarily through text messages. Defendant also showed up uninvited at O'Connor's residence, expressing resistance to the breakup and a desire to co-parent the expected child. Close to the time of the attack, Wickizer sent defendant a message showing himself with O'Connor and using kissing-face symbols, although Wickizer denied having a romantic relationship with O'Connor.

-1-

According to trial testimony, on the day of the stabbing, defendant sent messages to Wickizer threatening to fight him, and arrived at O'Connor's in the evening with a knife. Defendant parked behind a vehicle containing friends who were visiting O'Connor and Wickizer, walked up to Wickizer, who was talking to the occupants of the vehicle, with the knife concealed behind him. Defendant struck Wickizer without speaking and pulled his body onto the knife. Defendant quickly fled the scene and discarded the knife, but was soon arrested. Wickizer survived the attack after emergency surgery. Five people at O'Connor's residence witnessed the crime, and multiple security cameras recorded it. The defense was that defendant acted out of spontaneous emotional distress and did not intend to murder Wickizer.

Defendant raised several arguments on appeal. First, defendant argues that the visiting judge presiding at his trial was unconstitutionally assigned to that position. Second, defendant claims that the trial court improperly excluded evidence of defendant's emotional state as it related to his relationship with his father. Finally, defendant argues that resentencing is required because the trial court sentenced him using an inaccurate sentencing guidelines range. While we do not find merit in any of these appellate claims, we agree with defendant that the trial court must establish the correct assessments for PRV 2 and OV 12 on the record, adjust the operable guidelines sentencing range accordingly, and correct the presentence investigation report (PSIR) to reflect those adjustments.

## II. STANDARDS OF REVIEW

This Court reviews a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion. *People v Muniz*, 343 Mich App 437, 441; 997 NW2d 325 (2022). Likewise, a trial court's denial of a motion for resentencing. See *People v Divietri*, 206 Mich App 61, 66; 520 NW2d 643 (1994). A court abuses its discretion when it chooses an outcome that is not within the range of principled outcomes. *People v Orlewicz*, 293 Mich App 96, 100; 809 NW2d 194 (2011). However, to the extent that a motion for resentencing was based on an issue of law, review is de novo. See *People v Latham*, 334 Mich App 501, 505; 965 NW2d 248 (2020). This Court reviews a trial court's evidentiary decisions for an abuse of discretion. *People v Martzke*, 251 Mich App 282, 286; 651 NW2d 490 (2002). This Court reviews "the constitutional question whether a defendant was denied the constitutional right to present a defense" de novo. *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002).

However, unpreserved claims are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Reversal is warranted only if the plain error resulted in the conviction of an innocent defendant, or if "the error seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the defendant's innocence." *Id.*

## III. VISITING JUDGE

Defendant argues that the Michigan Supreme Court, through the State Court Administrative Office, lacked the authority to assign the defendant's presiding judge because the assignment violated the Michigan Constitution. Defendant's primary argument is that the assignment of the visiting judge created a new judicial seat because it carried a four-year term,

renewable annually, that could properly be filled only by election or gubernatorial appointment rather than by assignment.

The Michigan Constitution provides as follows:

> A vacancy shall occur in the office of judge of any court of record or in the district court by death, removal, resignation or vacating of the office, and such vacancy shall be filled by appointment by the governor. The person appointed by the governor shall hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs, at which election a successor shall be elected for the remainder of the unexpired term. Whenever a new office of judge in a court of record, or the district court, is created by law, it shall be filled by election as provided by law. The Supreme Court may authorize persons who have been elected and served as judges to perform judicial duties for limited periods or specific assignments. [Const 1963, art 6, § 23.]

This provision plainly sets forth the procedures for filling vacancies or new judicial seats, as well as for "specific assignments" of judges "for limited periods."

Defendant argues that because there was no vacancy or new judicial seat created in the Ingham County Circuit Court, assigning a judge to that court was a constitutional violation to clear a backlog of cases. This argument was rejected by this Court in *People v Sardy*, 216 Mich App 111; 549 NW2d 23 (1996), wherein we rejected a defendant's argument that Const 1963, art 6, § 23 "restricts the authority of the Supreme Court to appoint visiting judges to only those situations in which a vacancy occurs in the office to which the judge is appointed," and therefore that "the visiting judge in the case at bar was improperly appointed because no such vacancy existed." *Sardy*, 216 Mich App at 117. In rejecting the argument, this Court noted that an earlier version of that constitutional provision "did restrict the Supreme Court's authority to appoint visiting judges to the filling of a vacancy until a successor judge was elected and qualified," but that restriction was omitted from the current version, indicating an "intent to broaden the use of visiting judges," and we concluded that the Supreme Court now had the general authority to "authoriz[e] the appointment of visiting judges 'to perform judicial duties for limited periods or specific assignments.' " *Id*. Here, the order assigning defendant's visiting judge, David L. Jordon, states that it did so as part of an effort to relieve the "significant backlog in pending criminal trials caused by the prolonged COVID-19 pandemic."

Defendant further argues that the assignment of a visiting judge for years violates the requirement that such assignments be for "limited periods." However, the constitutional provision includes no time limitation other than "limited periods," and apparently, no statute or case law defines "limited period" for this purpose. Further, in *People v Fleming* 185 Mich App 270, 274-276; 460 NW2d 602 (1990), this Court affirmed the Michigan Supreme Court's assignment of visiting judges to open-ended terms. Thus, defendant has not demonstrated that the assignment of the visiting judge presiding over his case was contrary to the constitution, or otherwise not authorized by law.

Defendant further argues that the assignment of a visiting judge when there is no vacancy on the court violates the separation of powers doctrine. The separation of powers doctrine is expressed in Const 1963, art 3, § 2, as follows: "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." The legislative power for the state is reserved to the two houses composing the Legislature as follows: "Except to the extent limited or abrogated by article IV, section 6 or article V, section 2, the legislative power of the State of Michigan is vested in a senate and a house of representatives." Const 1963, art 4, § 1.

Defendant argues that "by creating and filling the newly created position in the sole discretion of the judiciary, Ingham County violated the separation of powers doctrine because the filling of a new position is left exclusively to the election by the citizens of the county or the temporary appointment to a vacated judicial seat by governmental (Executive) appointment." However, the Supreme Court "has exclusive rulemaking authority with respect to matters of practice and procedure for the administration of our state's courts." *People v Watkins*, 277 Mich App 358, 363; 745 NW2d 149 (2007).[1] Further, MCL 600.219 provides as follows:

> The [Michigan] [S]upreme [C]ourt has a general superintending control over all inferior courts and tribunals. The [S]upreme [C]ourt has the authority to issue any writs, directives, and mandates that it judges necessary and expedient to effectuate its determinations and to take any action it deems proper to facilitate the proper administration of justice.

See also Const 1963, art 6, § 4 (granting the Supreme Court "general superintending control over all courts"). Additionally, MCR 8.110(C)(3)(g) authorized the chief judge of the Ingham Circuit Court to exercise "administrative superintending power and control" to "request assignments of visiting judges and direct the assignment of matters to the visiting judges." According to the clear language of the Michigan Constitution of 1963, Article 6, Section 23, visiting judges can be used broadly to provide judicial services for limited periods. Defendant's claim that his judge was assigned to a newly created position is an inaccurate description as it disregards the explicit authority of the Michigan Supreme Court to assign visiting judges for specific purposes, such as reducing COVID-19-related docket congestion, for specified periods.

IV. EVIDENCE

Defendant argues that evidence of his lack of a relationship with his father and how it affected his behavior was erroneously excluded from his trial. Defendant believes that this error violated his fundamental right to present a defense, pointing to instances during where the trial court denied defendant attempts to offer evidence regarding his emotional state.

---

[1] See also Const 1963, art 6, § 5 ("The supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts of this state.").

During trial, defense counsel asked defendant's aunt, Kathleen Boss, "We learned earlier in the trial that [defendant's] father was absent from his life after he was born. Is that true?" The prosecuting attorney objected, and the trial court sustained the objection on grounds of relevance. Additionally, while testifying about defendant's hopes for moving to Michigan, Boss stated that "he was excited to be able to be a dad himself and do a better job than what his father had done with him and how he was raised," which the trial court struck from the record as irrelevant.

The United States Constitution gives criminal defendants the right "to present a complete defense." *People v King*, 297 Mich App 465, 473; 824 NW2d 258 (2012). "Few rights are more fundamental than that of an accused to present evidence in his . . . own defense." *People v Unger*, 278 Mich App 210, 249; 749 NW2d 272 (2008). A "fundamental element of due process" is the right to present the defendant's version of events through witnesses. *Washington v Texas*, 388 US 14, 18-19; 87 S Ct 1920; 18 L Ed 2d 1019 (1967). However, the right to present a defense is "not unlimited and is subject to reasonable restrictions." *King*, 297 Mich App at 473-474. A defense "must still comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id*. at 474 (quotation marks and citation omitted). The right to present a defense is thus limited "to relevant and admissible evidence." *People v Solloway*, 316 Mich App 174, 198; 891 NW2d 255 (2016).

 "Generally, all relevant evidence is admissible at trial." *People v Aldrich*, 246 Mich App 101, 114; 631 NW2d 67 (2001). See also MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "Under this broad definition," evidence that is useful in shedding light on any material point is admissible. *Aldrich*, 246 Mich App at 114. To be considered material, evidence does not necessarily have to relate to an element of the charged crime or an applicable defense. *People v Brooks,* 453 Mich 511, 518; 557 NW2d 106 (1996). Rather, the "relationship of the elements of the charge, the theories of admissibility, and the defenses asserted governs what is relevant and material." *People v Yost*, 278 Mich App 341, 403; 749 NW2d 753 (2008) (quotation marks and citation omitted).

Defendant argues that Boss's testimony regarding the lack of a healthy relationship between defendant and his father was relevant to defendant's theory that he did not intend to kill Wickizer, but was acting out of his emotional distress at the prospect of being excluded from caring for his child with O'Connor.

However, the record makes clear that the trial court provided the jury with appropriate instructions regarding defendant's emotional state as a potential mitigating factor in determining his intent. This included clarifying that defendant could only be found guilty of assault with intent to commit murder if he would have met the intent requirement for murder had the victim died. The court also explained that acting on "emotional excitement to the point that an ordinary person might have acted on impulse without thinking twice" did not meet that standard.

O'Connor testified that she told defendant that she was pregnant in December 2020, after defendant moved to Michigan in November 2020, and that she consistently communicated to defendant that she did not want to be involved with him but that he could be a part of the child's life, and that account was supported by evidence of text messages she sent to defendant in the two days before the assault. Defendant testified that O'Connor had not always been supportive of his

involvement in their child's life, but eventually communicated that he could have access to the child. Defendant further testified that Wickizer communicated to him that he was planning on raising the baby with O'Connor, and that he felt "betrayed" and "devastated" by Wickizer's relationship with O'Connor.

Wickizer denied communicating that he was dating O'Connor or offering to help with the child, and no messages were admitted suggesting that Wickizer wanted to be involved with the anticipated child. Wickizer testified that he was not in a romantic relationship with O'Connor, but admitted that he sent defendant the message showing Wickizer with O'Connor and a "kissing face" character because he was angry over defendant's messages to O'Connor. Wickizer stated that defendant sent messages asserting his refusal to allow Wickizer to raise his child, and threatening to fight Wickizer.

Defendant stated that he was "falling apart from the inside out," and that the emotional intensity of fighting with O'Connor on the phone for the three weeks up to the day of the attack produced a state of "mental chaos," with "debilitating" anxiety and depression. Defendant's friend, Ashley Pfister, testified that defendant was having "a nervous breakdown" on the evening of the attack, and had been upset for about two weeks from communications with O'Connor.

We conclude that it was not an abuse of discretion to exclude Boss's testimony that defendant did not have a good relationship with his father, and was excited for the opportunity to be active with a child because there was no link between the excluded testimony from Boss and any acute emotional state that might have compelled defendant to attack Wickizer. Boss's testimony about defendant's aspirations as a result of childhood deprivation did not provide information about defendant's emotional state at the time of his attack. Defendant's distress at the prospect of not having the opportunity to co-parent his expected child with O'Connor was not implicated by Boss's excluded testimony, and the excluded testimony did not provide information about whether defendant's emotional state on January 11, 2021, compelled him to attack Wickizer.

Alternatively, an evidentiary error does not merit reversal in a criminal case unless it appears "more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). Defendant cannot prove that excluding Boss's testimony significantly impacted the trial's outcome. Boss's testimony about defendant's absent father and its impact would have been redundant, as similar testimony was already provided by the defendant and O'Connor. Additionally, the objection to the question about defendant's relationship with his father was overruled, allowing defendant to answer and provide evidence to the jury. Therefore, the jury did hear about the impact of defendant's absent father without any interference from the trial court.

Although cited by neither party, another such instance occurred when O'Connor was asked on cross-examination, "How would you describe [defendant's] upbringing," the trial court overruled the prosecuting attorney's objection, and O'Connor testified that defendant had an adverse relationship with his father.

Additionally, as noted, defendant was allowed to freely describe his emotional state preceding the attack, including feeling "betrayed" and "devastated" by Wickizer's relationship with O'Connor, that he was "falling apart from the inside out," and in a state of "mental chaos,"

with "debilitating" anxiety and depression after weeks of emotional wrangling with O'Connor. As also noted, Pfister testified that defendant was upset, even having "a nervous breakdown," for about two weeks from his interactions with O'Connor. Thus, defendant's emotional state at the time of his crime was fully presented and explored, leaving the jury informed of the antecedents of the distress, mainly O'Connor's leaving defendant while reportedly pregnant, and Wickizer's support of her, and including how lingering attachment issues from an absent father contributed to defendant's psychological state, despite the limitations on Boss's testimony.

Defense counsel extensively argued in closing that defendant did not intend to kill Wickizer, but acted because of his agitated state. The argument included that defendant's distress resulted partly from his childhood experience, which exacerbated his urgent desire to parent any child that he had with O'Connor. Defense counsel made the case that impending fatherhood overwhelmed defendant: "I failed as a father with my son. I've done the best I can with my daughter. And I didn't want to lose another opportunity. This is what was driving him . . . . It was based on emotion. He didn't plan to murder this man, premeditated." Defense counsel closed by arguing that the jury could not properly find defendant guilty because of the mitigating circumstance of his emotional impairment.

Defendant argued that his emotional state at the time, including his difficult childhood and his hopes for parenthood, affected his intent to kill.

The trial court's decision to limit testimony about defendant's relationship with his father was correct and did not prevent the defendant from presenting his defense. Accordingly, defendant is not entitled to relief on this issue.

## V. SENTENCING

"A defendant is entitled to be sentenced by a trial court on the basis of accurate information." *People v Francisco*, 474 Mich 82, 88; 711 NW2d 44 (2006). "[A] sentence is invalid if it is based on inaccurate information." *People v Miles*, 454 Mich 90, 96; 559 NW2d 299 (1997). At issue in this case is the assessment of PRV 2, which concerns "prior low severity felony convictions," MCL 777.52(1), and was initially assessed at 30 points for "4 or more prior low severity felony convictions." MCL 777.52(1)(a). With that score, the guidelines range for defendant's minimum sentence for his assault conviction was 270 to 450 months, and the minimum sentence imposed, 360 months, fell within that range.

The (PSIR) included defendant's 31 prior convictions in California, four of which were felonies, based on information from the defendant, district court proceedings, and the Law Enforcement Information Network (LEIN). However, during the hearing on the posttrial motions, both parties agreed that the state of California had reclassified some of those felonies as misdemeanors. Defendant argued, based on California's registers of actions, that he had no prior felony convictions, while the prosecution argued, based on a LEIN report, that three of the convictions listed on the PSIR remained felonies.

With no low-severity felony convictions, as asserted by defendant, no points could be assessed for PRV 2, MCL 777.52(1)(e), and the guidelines range would be 171 to 285 months. With the three low-severity felony convictions, as asserted by the prosecution, 20 points could be

assessed for PRV 2, MCL 777.52(1)(b), and the guidelines range would be 225 to 375 months. Either calculation thus produced a lesser range than the 270 to 450 months before the sentencing court.

The trial court noted that the parties "are in agreement" that the "first reduction of guidelines, if the people are arguing for between 225 and 275 [sic, 375], and the other one would have been 171 to 285," but denied the motion for resentencing even if considering a reduced guidelines range.

When imposing a sentence, a court must consult the sentencing guidelines. MCR 6.425(D). This requires the court to score the sentencing variables, calculate the recommended range for the minimum sentence, and take that range into consideration when determining a sentence. *People v Lockridge*, 498 Mich 358, 391-392; 870 NW2d 502 (2015). A sentence that is "based upon an inaccurate calculation of the guidelines range" is "inconsistent with the law," and requires resentencing. *Francisco*, 474 Mich at 92.

However, in *Francisco*, 474 Mich at 91, the trial court was unaware that it was sentencing the defendant with reference to an inaccurate guidelines range. Here, the trial court confirmed with the parties that a reduction in the guidelines ranges was in order, but stated that it would stay with the sentence it had imposed despite any change in the guidelines range. The trial court noted that the guidelines range was advisory, and explained, "Even if the guidelines had been . . . appropriately 170 [sic, 171] to 285, I think 360 months is the lowest minimum sentence that I felt, in my discretion, was appropriate." The Court emphasized that the victim was fortunate to survive, and concluded that, in light of "the harm to the victim . . . , regardless of these scores, I'm just not able to go any lower than that on the minimum." Thus, the trial court made clear that, regardless of the guidelines range, it would issue a minimum sentence of 360 months.

In *Latham*, 334 Mich App at 506, this Court stated that resentencing was not required when the trial court had indicated its "intent to maintain the same sentence, regardless of the prior scoring error." *Latham* differed somewhat from the current case because the trial court had corrected the guidelines scoring before deciding to remain with its original sentence, which was within the guidelines range as corrected. *Id*. In this case, however, the trial court knew that a corrected guidelines range would have recommended a lesser minimum sentence, and asserted that, regardless, it was going to exercise its discretion to stay with the original sentence.

A sentencing court may depart from the advisory guidelines range without stating substantial and compelling reasons for doing so, but the sentence must be reasonable. *Lockridge*, 498 Mich at 365, 392. In this case, the trial court acknowledged two possible corrected guideline ranges but clearly stated that it intended to impose the same minimum sentence regardless so that resentencing was unnecessary. It was not an error of law to do so. *Latham*, 334 Mich App at 506.

However, even though the trial court did not commit an error requiring resentencing, a remand is needed for a hearing to determine the proper scoring of PRV 2 and establish the operative guidelines range on the record.

The parties agreed that OV 12, contemporaneous felonious criminal acts, MCL 777.42, was improperly scored and should have been assessed zero points, doing which would not itself

alter the guidelines range. The parties also agreed that PRV 2 was incorrectly scored but did not agree on the correct assessment, and the trial court did not resolve that dispute, thus leaving an incorrect assessment of PRV 2 and resulting in an incorrect guidelines recommendation on the defendant's record. "Critical decisions are made by the Department of Corrections regarding a defendant's status based on the information contained in the presentence investigation report." *People v Norman*, 148 Mich App 273, 275; 384 NW2d 147 (1986). When errors are found in the PSIR , it is necessary to send the case back to the trial court. This allows the court to fix the report and send a corrected version to the Department of Corrections. As a result, remand is necessary to ensure that the sentencing information record accurately reflects zero points for OV 12, correctly assesses PRV 2, and adjusts the guidelines sentencing range appropriately. *Id*. at 276

For the reasons stated, we affirm defendant's convictions and sentence, but remand for a hearing to clarify the correct assessment of PRV 2, and adjustment of the guidelines sentencing range to consider the correct scoring of PRV 2 and OV 12, and correction of the PSIR to reflect these determinations. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Christopher M. Murray
/s/ Anica Letica